We'll hear from the appellant's lawyer, Mr. Lin. Good morning, and may it please the Court. Albert Lin on behalf of Appellant Ramaco Resources. I have with me at council table my colleague, David Parker. This insurance appeal concerns the district court's modification of two categories of damages awarded by the jury. First, contract damages, and second, damages for aggravation and inconvenience under West Virginia's Hayseeds Doctrine. At a minimum, we ask this court to restore what the jury awarded. We believe the district court misread the policy as to contract damages and misapplied West Virginia law as to Hayseeds damages. Tell us about the factional. You've got these three silos. Interesting case. Yes, Your Honor. At least factually. The law is a little bit complicated. Tell us about just a two-minute factional. Of course, Your Honor. So factually, what we have is basically a coal processing facility. And so when the coal is mined, it comes over and has to be essentially sorted and then taken up to a cleaning plant. And what you have to facilitate that process is three fairly large silos. You might sometimes see them when you drive down the road. And in each silo is a hopper, which is basically a giant funnel. And so imagine you've got a very tall silo, and inside is a funnel in each one. And so the coal is delivered to a conveyor belt. It's taken up to the top of the silos. It gets distributed into the three silos. And the hoppers, these funnels, control the flow of the coal, and that goes down to another conveyor belt that's below them, and it's taken up to the processing plant. And the facts here is the very first silo, the hopper collapsed, and that rendered it unusable. And we had to take some measures to kind of get back up and running. And the question here, under the insurance policy, is essentially how long did it take for us to return to the level that the policy requires. And for that period of restoration, the district court altered course at least three times, correct, as to what the end date for the reasonable period of restoration was? That is correct, Your Honor. And the jury verdict was based on the March date, is that correct? That's correct. And then the district court post-jury verdict altered it and said, no, the period of restoration was back in November 30th, and that's why the district court reduced the damages award. Yes, Your Honor. So if we conclude that the district court was incorrect, that the period of restoration was beyond November 30th, maybe March, maybe later, do we need to send that back for a new trial? So two answers to that, well, maybe one answer to that, Your Honor, which is we have requested that if you agree with us, that it go back only for a new trial on the period between March and June. And that's because the district court had precluded, and this gets to your question about the three times, at first he had allowed evidence to go to the jury that would have allowed them to conclude possibly that the period had gone to June. Mid-trial he said, no, no, I'm only going to allow evidence that could show that it went to March. And then after trial, although the jury agreed with us, he then reduced it to November. So what we would ask if you agreed with us is that you allow the judgment entered by the jury and the damages to March to remain and send it only back for a limited trial. Let me understand. I mean, I totally get you want to make this sort of alternative argument, but it seems a little hard to make this conditional sort of claim. It seems like to me you sort of have to decide under Judge Thacker's question that you've got to pick one, because here the damages from March to July aren't really separate and distinct from October to March. There's a continuation, and I think we could reasonably have disagreements about exactly where each of those damage numbers fits. And so since they're not truly separable, it seems like to me you've either got to accept the March number or we've got to retry the entire thing. I can't understand, frankly, how we're going to do the avenue that you're sort of maybe 1A choice. Of course, Your Honor. Two answers to that. The first is I think they are separable, and I think that's evidenced by what actually happened here on the ground. The judge said in mid-trial you can't present evidence of damages that go beyond March. So there was a bunch of evidence that we had teed up. We had spreadsheets. We just didn't present that. And I think so what we're arguing is that we can present just that evidence to a new jury, and then in the larger sort of theoretical, you know, is this something that can be done? We think it can be done. It's been requested before both pieces of this. This court has contemplated and ordered limited-scope trials, and this court has also contemplated and respected, and the Atlantic Coastline Railroad case I think is the best one, this concept of allowing the plaintiff a choice between, you know, does it have to go? If it can go back in a limited-scope trial, we'll take that. But if it's going to have to upset the piece of the judgment that has been upheld by this court, right, because we're assuming that you have upheld the original contract damages, then we shouldn't have to risk that. And I think, Your Honor, maybe one compromise here would be you don't have to figure out for yourselves whether it's something that can be done. If we're in this world, you could remand to the district court this question, whether a limited-scope trial is possible, but instruct the district court that if he concludes that it can't be done, we should be given the choice whether to just take the contract damages or retry. But to be clear here, if we concluded that you prevail on the merits and we agree with you it's not limited to March, rather than a full retrial on damages, you would accept the damages that you have now? That is correct. That is 100%. And I realize you think the scope of the damages goes beyond March, but what was it that happened in March that would set that as the demarcation for when operations were reasonably restored? So what happened in March was, so there's two temporary measures were taken. On November 30th, we had built, and, Judge Winant, I appreciate your question of asking to set out the facts. What happened at the end of November is we created what we call the temporary bypass belt or colloquially referred to as the pony belt. And that was a temporary conveyor belt that went under the silos. And the reason that happened is because that was the quickest way to get back up in some semblance of operation. It actually used part of the belt that was under silos 2 and 3 that hadn't been damaged. What happened in March was that we completed the permanent bypass belt, which is a little bit of a misnomer, but it's a belt that actually was newly created and didn't go under the silos, and so it made it possible for us to repair silos 2 and 3. So as of March, silo 1 was repaired. It's post-March when you're dealing with silos 2 and 3 and correcting what you argue is the impairment that was caused as a result of silo 1's failure. Is that correct? Almost, Your Honor. Silo 1 was never actually repaired. It was because the damage was so exhaustive we just left it alone. But essentially the same thing. We completed a new conveyor that allowed us to get to silos 2 and 3. But silos 2 and 3, appellant never made a claim as to silos 2 and 3, for coverage specifically, correct? We did not claim the direct recovery. We claimed the repair as part of the business interruption. And we think that that gets to this sort of second piece of this. If you look at the language for business interruption, what it says is, and there's two quotes I think that are important. One, this is at JA-495, we will pay for the actual business income loss you incurred due to the actual impairment of your operations. And then it goes on to say, quote, that the, quote, impairment of operations must be caused by or result from direct physical loss or damage to covered property. The district court concluded that that further repair, that operational impairment of 2 and 3, was not covered because silos 2 and 3 themselves did not suffer direct physical loss. Now, there are two problems with that. The first is this language that I just read you, Your Honors, it doesn't require that silos 2 and 3 themselves suffer direct physical loss. It says that the operational impairment must be caused by or result from direct physical loss or damage to covered property. It could be somewhere else. And so what we have here is there's no dispute that there was an operational impairment to silos 2 and 3. There's no dispute that there was a direct physical loss to silo 1. The question is, was there a causal relationship and should that have gone to the jury? The physical impairment to silos 2 and 3 was already present when silo 1 failed. So it wasn't caused by. . . I can't see how it was caused by the failure of silo 1. Well, Your Honor, so the answer to that is, and just to sort of borrow the phrase that you just used, you said physical impairment. And I don't think that the word is operational impairment. I think that's important. Because imagine if I can give you an example. Let's say you have a heart condition that you don't know about. It exists, but you don't know about it. If you did know about it, let's say it gives you a greater risk of a heart attack if you do extreme physical activity, if you go to high altitudes like Denver. You go to the hospital for a broken arm and then you find out you have a heart condition. Yes, and so then you find out you have that heart condition, you are now, that knowledge creates a new impairment. You are saying the discovery of it is sufficient. It's sufficient that what resulted, what happened with silo 1, which I understand you eventually destroyed, is if that brings you to the scene to cause you to then look at 2 and 3 because that should remain silent and then you discover there's a safety problem, that's enough? Under the language of this contract, Your Honor, and this is unique. What if it's this? In silo 2 and 3, that absolutely was not the cause of the damage that happened with silo 1. Do you say that's covered too? I think it depends on what kind it is because it has to be the same thing because it's a discovery of something. It isn't, Your Honor, because that's not all that's there, right? The thing that you discover has to result in an operational impairment, so it's got to be something very serious. Okay, so you discover something totally unrelated to silo 1. In the process, silo 1 goes down, you destroy it, it's good. Now you said we've got to check silo 2 and 3 out, and you do, and you find something totally unrelated to silo 1 and 2, and now your operations has to cease. Covered? I think that's a harder question, Your Honor, and ultimately it comes back to the question of causation, right? The language is operational impairment caused by direct physical loss. Causation is usually a jury question, as this Court well knows. Sometimes the facts are so attenuated that a district court rightly says there cannot be causation as a matter of law, and, Your Honor, maybe in your situation where it's something totally unrelated or maybe the direct physical loss is somewhere way removed geographically from the plant, from this particular other thing, that's too attenuated to send to the jury. But here- You're presenting a thought-provoking situation here for us to consider. I mean, it's almost tenuous where you're going with it, but at the same time you want to focus on the business interruption as being the matter, not the physical loss of silo 1, and you're saying business interruption then flows to anything else that is caused by 1, and that's where Judge Thacker was going with that term caused. That's, I think, where this case will come to rest. Absolutely, Your Honor. Whether you have presented evidence to show whatever you found in 2 and 3 was caused, I'm not sure discovered is enough or is it? I mean, that's the- And that's the question, Your Honor, right? It's a question of was there enough for the question of causation to go to the jury, and we think yes. Now, if I could just take a step back, though, I think it's important to remember the causation issue is not what the district court ruled on, right? This went to the jury, and he pulled it back from the jury after the damages because he said there was no direct physical loss. Let me ask you this question. I don't want to interrupt you too much there, but those flaws that were in silos 2 and 3, did they exist before this accident? They did, Your Honor. They're the same as the ones that caused- Did that matter? Well, I don't think so, and this gets back to the hard example that I was- I mean, we're getting back to the causation. How do you cause something that's already there before it happens? How does an accident cause those flaws in 2 and 3? An accident hasn't even happened. Well, I think the answer to that is you've got to go back to the policy language. What is being caused? And here the policy language says it's the operational impairment that is caused, not the flaws, the operational impairment. And the reason I was raising the hard example is you can have an existing defect where the impairment doesn't exist until you have the knowledge. And that's what the language here is. Now, they cite a bunch of other cases- Here's another question, and I'm just going with where you're going. You've got two flaws in 2 and 3. You really already have an operational impairment under your statement because those flaws are already there. You just don't know they're there. So you're saying it isn't until you find out that an insurance company becomes liable for an operational impairment, or could it have just said, you know, those silos over there, I think they've got some flaws in them. They are covered. Again, I think it's the language, right? It's impairment. And I think you can contrast it to other language. They cite these other cases where the coverage is only for the repair and replacement of the damaged property. That's far narrower. My last question. Of course, Your Honor. What if the accident never happened and you found the flaws? Would they be covered? No. Maybe under some other, right, we could talk about other coverage provisions, but under this, if the accident hadn't happened- Two flaws in two and three that were not coverable, but once an accident happens, you're covered for two and three. Actually, Your Honor, if I could take that back. Which one are you taking back? The no. There is coverage. So because we have two, and my time is about to expire if I may answer this. So when it says impairment of operations must be caused by a result from direct physical loss, we have two ways we think we fit under that. The first is what we've been talking about. Tell us about it when you come back on the boat. Of course. While it's on my mind, since we're talking about hearts and broken arms, I understand the argument that you've made, but I understood you to be making also a slightly different argument. That is, if I try to use Judge Wynn's heart example, if I break my arm, then there's a question of what's the reasonable speed in which to fix that arm. My arm's the silo here. If I go into the hospital and they say, you need screws, but when they're getting ready to put screws in, they figure out I've got a heart condition. That is, silos two and three have problems. So the doctor says, I can't put screws in because of your heart condition. So now it's going to take longer for my arm to heal because of my heart condition. In other words, the reasonable speed to heal, they can't put screws in, so it's going to take longer. And so I thought you were making, as an alternative argument, that two and three interfere with the reasonable speed to get operations back up to where they needed to be. Not necessarily that two and three are their damages covered. It's just that that delayed your reasonable speed in fixing the operations from the loss to one. Am I missing that? Or did I not articulate it clean enough, given our medical example? Your Honor, I think the reasonable speed is a slightly different question. I mean, it says that the period of restoration, that goes to the question of the period of restoration. The period of restoration ends when. Right, but my point is, I think it gets you to the same point, right? So what I'm saying is, we know there was some loss caused by the damage to one, right? The question was, how long did it take you to restore your operations to get business income back to the point? And your opponent says, so there's definitely causation there. Your opponent says, right, but it doesn't encompass two and three. All right, fine, even if that's true, I guess is my point. The impact of two and three could also be on the reasonable speed to get one back up and running. That's correct, Your Honor. Right, and so it can get you. My point is, it seems like to me there are two separate arguments. One, two and three are covered, and I get that that's the district court rejected that argument, but that's a plausible argument. And then the second argument is that the problems with two and three delayed, reasonably so, the time it took you to get up and running, you know, back to operations to develop the correct business income. And that would be a fact question, Your Honor, that would go to the jury as to, you know, how long it takes us to get back to the business but for business income level. And so that comes back, of course, to his interpretation of period of restoration where he said it's tied to throughput, and we say it's tied to business income. Thank you, Your Honor. Thank you. We will hear from the appellee's attorney, Mr. Hacker. Good morning, Your Honor. Yeah, still morning. Good morning, Your Honors. May it please the Court. Rameco's property insurance policy covers economic losses from the impairment of business operations, but the impairment must be caused by, this is quoting the same language Mr. Lynn quoted, must be caused by or result from direct physical loss or damage by a covered peril to property. The question that was just articulated at the end. So if I understood the question correctly, I think Mr. Lynn's first answer was the correct one, which is that is about how you interpret the scope of the period of restoration and the time it takes, reasonable speed, to get back up to operations. This is an antecedent question, Your Honors, about whether or not the impairment we're talking about, the fact, if there's an impairment, right? The other point the judge correctly held below is that there wasn't an impairment as of November 30th. But assuming there's an impairment, why is there an impairment? We know there's an impairment. One fails. And the jury found there's an impairment. Right. So at some point in time, there's impairment. The question is, how long does that run? And the district court asked the jury to say, you've got to figure out the period of restoration. And, right? Not quite. Not quite. If I could just. Help me understand what I'm. So there's two arguments. There's two reasons that there's no recovery after November 30th. One of them is that what the judge said after the trial as a matter of law, the impairment stopped. There was no impairment as of November 30th. Right. That's the question about how you measure it with throughput or profit, an argument they didn't make below. That's one reason. A separate reason, separate, analytically separate, with no overlap, is that assuming there is an impairment as of November 30th, right? There's an impairment. Why is there an impairment? What's causing the impairment? Up until November 30th, what caused it was the destruction of the hopper inside silo one. As of November 30th, it is undisputed, fully agreed, that they could have used silos two and three, right? And fully restored operations. Nobody disputes that except for one reason. But no. I think no, that's not correct. And that's not what the jury was instructed. Right? Let me take a step back, right? So in a directed verdict post-trial, is the judge trying to determine whether a reasonable jury using the jury instructions could have found for the plaintiff? That's part of it, yes, unless there's some other legal barrier. But the point here is that on the undisputed facts, this is not a disputed point. Silos two and three could have been used to restore operations. It was admitted at trial. That's absolutely undisputed. The reason they weren't used is that, and this is also undisputed, they decided to make an upgrade, right? They made an upgrade. And it's a legal question as to whether or not the decision to make an upgrade was caused by the collapse in silo one. That's a factual question, right? Because there's a question of whether two or three could have been used. You might well argue to the jury, listen, reasonable speed would have been to use two and three, right? I mean, that's a reasonable argument you can make. And the jury is so instructed, right? You got the judge to instruct them that the restoration does not include any period of time required to upgrade undamaged property. You got that instruction. And you could argue that they could use two and three. Now, they got an argument, no, we couldn't use two or three, right? That was not a reasonable way of doing this. And that's what the jury decided. But I guess another way of putting it, maybe it's saying the same thing a different way, is it's not reasonable for a jury to conclude that their decision not to use silos two was caused by direct physical damage to property because it is damage to silos zero. Silos two and three were perfectly, were the exact same state. Every molecule was the same after the damage to silo one as they were before. What silo one. So I have a question then focusing just, did that answer you? It didn't, but I'd love for you to go ahead. Okay, can we talk about just silo one then? Absolutely. Let's assume silo two and three, they don't count. Silo one, the measure of damages, throughput versus, or the measure of the restoration period, throughput versus business income. Why is it throughput versus business income or profits when it clearly says business income in the policy? Two answers, and my first answer is that's not an argument that is presented in this case. They didn't raise it below. It's unambiguously waived. Nowhere at any point, any time before, during, or after trial. How about the jury instructions? So the jury instructions say it. The jury instructions only quote the language of the policy. They don't make an argument about net profits being. Which is like a model of clarity, right, that it's not throughput, right? I mean, even a jury, you don't need to be a lawyer to understand that. I mean, the jury was instructed that it's not just throughput, right, but it's operations to generate the business income that would have existed. Right, but they didn't make an argument. There's no economic expert. There's no accounting expert who came in and said to the jury, again, before or after trial, that here's what the net profits were beforehand. Here's what the net profits would have been. Afterwards, they argued to the jury, based on the instruction, they argued to the jury that what matters is the operational level, and there was a fight between the parties over how you measure the operational level. And that was the only fight, both before, during, and after trial, as to how you correctly measure the operational level. Here's what they say. I mean, you can look at their summary judgment brief at pages 89 and 90 of the joint appendix, where they say, this is them, in their summary judgment brief. Here, the period of restoration is measured by operations, not by repair or replacement of property. That's what they say there, because that was the fight of summary judgment. It's a question of whether operations means output, or operations means, like, output with similar expenses. That's why they focus on expenses, right, because the spot price of coal is going to change, right? And so the revenue number, they can't change that number, right, because whatever the price of coal is. The only thing that's changing business income for them is expenses, and so that's why they're saying we're having to get rid of shifts, and we're going to have to bring people in, and we're having to pay people to do these things. The only part of business income that changes, right, are output or throughput, I'm not sure what the difference is there, and expenses, and so they talk about expenses. Your Honor, that's with respect, and I urge you to please go back and read every citation. That's their argument. Every citation where they say they talked about expenses, they say in their appellate brief what you just said. The reason we were talking about expenses was to establish profit. When I look at their damages, I mean, we look at the damages. It includes these expenses, right, and that's what's given to the jury. I get the summary judgment, but, like, this is what's given to the jury, and the jury has given these instructions, and they've got this evidence, and so I'm having a little hard time understanding, like, why the jury couldn't reasonably find exactly as they found. Because as to expenses, the reason they're arguing to the jury what the expenses are is, remember, extra expense is a covered item of damages. They're trying to establish what their extra expenses were, not to net them out from the revenues. There's no argument anywhere about netting it out and what the net profits were beforehand and what they hypothetically would have been absent. They never make that argument. The expenses are in the record because they're trying to recover extra expense, which they're entitled to if they prove it. So they've tried to prove it. Nowhere do they make a netting kind of argument. It just doesn't exist, Your Honor. So if that's true, your argument is, we should pretend that this contract says something it doesn't. I mean, we don't typically, like, interpret legal things that way, right? I mean, we're just going to pretend it says throughput because you think they didn't specifically make the argument enough, but we don't do that with statute. We don't do that with statutes, right? If somebody gets the statutory interpretation wrong below, right, the legal question comes to us. We interpret the statute because it's a question of law, right? This is a contract that's, like, unambiguously clear, at least in my opinion, and you want us to just say because they didn't quite make the argument that we should say it means something it plainly doesn't. So a couple of points. First of all, it's absolutely the core foundation of appellate practice. It's not a court of first review. This is not the place for the first time in this litigation to be evaluating what that language provides and how it applies to the facts of this case. It matters we're looking at a directed verdict, right? So the question is because the jury was instructed by the plain language, right? And so we're just looking at what the plain language was. But the jury wasn't given the tools. There's no testimony about what net profits were before, how you do the net profit analysis, which expenses count as part of the net profit versus extra expense. Remember, extra expense is separately recoverable. On this theory, you would have to sort out, otherwise you're going to have double counting, right, what is a recoverable extra expense and what's just a diminution of your business income. They didn't make any effort to sort that out because they didn't make this argument. So perhaps if we sent it back for a new trial, the jury would have that opportunity. I mean, if we're ever to go back, they could raise this argument. But I'm not familiar with any president of this court saying they didn't raise an argument, but let's let them go back and try. But can I make one example about the difference, why we don't just sort of read a policy for all the language when a new interpretation is made for the first time on appeal. This policy, remember, and they make this point in their brief. Some policies like this measure the period of restoration merely by replacement or repair of property, full stop. This one says not just repair or placement, but also that you measure it by when the impairment of operations, the impairment of operations to the level that would have been, right, absent the damage. If they had come in, if they argued below only about the time it takes to repair the property and never said a word about the impairment of operations in any sense, I think it would be unfathomable for this court to say, well, it's not solely a repairment policy, but there's this additional language. Nobody raised it below, but they should have, so we're going to interpret the policy that way. It doesn't make any sense to this court. Let me just make sure. Did you object to the jury instruction? I mean, are these your jury instructions? The jury instruction just quotes the policy language. I understand, but you agreed you didn't object to these jury instructions. Not on this point. We said the jury can have the policy language. That's fine, and then the parties argued to the jury how the jury should apply that language. It's not just the policy language, right, because you had them, you included the period of restoration does not include any increased period of time required to upgrade or improve undamaged property. That's the interpretation, right? I mean, I get that's not in the language itself, right? You convinced the district court to include that, maybe rightly or wrongly, that's the argument we went through before. But, you know, that's not the language, right? You're putting in your defense, right? You gave the jury your defense, but otherwise the jury got the policy, which seems abundantly clear. So, again, yes, the jury got the policy language, but they didn't get, that's kind of the point, Your Honor, they didn't get any instruction and no argument was made to them and no evidence was provided to them about how to compare net profits beforehand and what goes into a net profit analysis and what goes into and how to determine net profits that would have occurred absent the damage, right? The jury had no instruction on that because nobody argued it. That wasn't their argument. I understand your position. Then I have another question. Let's assume we get beyond what the period of restoration is measured by, business income versus throughput, and we get beyond this silo one versus silos two and three. And what if we determine that the March date is the appropriate period of restoration date, the verdict of $7.6 million is reinstated, then what happens with the hayseeds argument? What happens with hayseeds? If all of that. I know you don't want all of that, but if. I do want to go back to the causation argument that I think the appeal turns on, but let me answer your question directly, which is that the hayseeds damages would be set aside as a matter of law because they didn't substantially prevail even under the $7.6 million award under West Virginia cases that set forth the standard for what it takes to substantially prevail, which is there's no ambiguity in the standard. It says you must obtain an award that is, quote, equal to or approximating the amount claimed by the insurer in the most recent case on the point says immediately prior to the commencement of the action. And there's some, I think, back and forth in West Virginia cases over whether it really must be you must make an award or make a demand right prior to the action or do you account for settlement demands during the action. But either way, we have no problem including the settlement demands made during the action because they're almost all substantially larger than the $20 million in contract damages they requested in the complaint. They were $32 million, $25 million, and then finally. Why do you say 20 meaning contract damages? I took the settlement offer to be contract and hayseeds damages. No, this was in the complaint. In the complaint they said our contract damages. All right, but whatever the number was that they offered right before or during trial, I took that number to be an inclusive number. So it may be inclusive, but they didn't separate out what they thought the contract damages were. Right, but we can look at it and say, like, listen, it has to be inclusive of both claims, right? They're not separate claims technically, but the hayseeds claim and the contract claim. And so we wouldn't look at that and say it's purely a contract claim. It's both, right? But I think it's incumbent on them, and the West Virginia Supreme Court said so. It's incumbent on the parties that are making demands to be clear about what the demand is. If they don't say, you know, we said it's $20 million, $32, you know, millions and millions, and now we're saying $12 million, and don't say, you know, how much of that is contract damages, I mean, the hayseed damages are going to be very uncertain, right? It's hard to count on hayseed damages or any measure of substantial hayseed damages when you're a publicly traded corporation. As you said, you also argue that Rameco didn't appropriately plead hayseeds damages, correct? That's correct. Did the district court have an opportunity to consider that argument? Yeah, the court considered it beforehand and didn't agree, and then didn't address it afterwards, didn't reach the argument. Did not agree with you? That's correct. Beforehand, which is part of when Rameco is citing points at which the parties, you know, agreed that there would be hayseeds damages because the court had not agreed with us. I think the court was plainly incorrect about that. But also, the parties were talking about attorney's fees under hayseeds, which they unambiguously did request. So, you know, the negative pregnant from that is they specifically want attorney's fees hayseed damages. They never say a word about aggravation or inconvenience until just before trial, and so it was not pled. We were on no notice that we needed to take discovery and factual development as to the nature of the emotional sadness and suffering this publicly traded corporation experienced. Without that notice, it's not fair to impose aggravation or inconvenience damages on us. If I could just return to the causation question, because I think the… Can I ask one more question on hayseeds? You say it must be equal to or approximate, but the language that I focused on was substantially prevails. Yeah. And those are obviously, like, very different, right? You say it must be equal to or approximate to the demand, and at least some West Virginia Supreme Court has said substantially prevails. Why is it not substantially prevails and instead equal to or approximate? So, it is substantially prevails, but the West Virginia Supreme Court has, without exception, said that a plaintiff and insured substantially prevails if but only if they get an award or a settlement equal to or approximate. I mean, the cases are Jones, they're Miller v. Flaherty, they're Jordan, they're the Hardin case that they cite. Every case is… There's no ambiguity about this. That's the standard for when you substantially prevail is you have to get an award or settlement equal to or approximating what you demanded, you know, looking all in at the demands. I'd like to hear your argument about the $25 million being punitive versus just for aggravation and inconvenience. I think that's connected to the lack of evidence supporting $25 million as the outcome. The only inference is that it was based on passion and prejudice and must have been punitive because literally the only evidence is their COO testifying that there was stress on the company and stress on some employees who are not plaintiffs here. The employees aren't claiming aggravation and inconvenience. It's a publicly traded corporation that says it suffered this emotional harm, and he just says it's stressful in various ways. But they didn't claim any net economic loss damages. Remember, there's no financial stress proven. They admit that they were able to pay all their debts. They admit that they made payroll every time. Did the district court get the opportunity to rule passive on your argument that because this is a corporation, they're not entitled to pay seeds? The court didn't reach that argument because… That's why the court didn't reach it. Okay. If I can just say a word about the example we talked about. I mean, it's useful, I think, because it actually proves our point that if you go into the hospital for an injured arm and then they discover a problem with your heart before anything has happened to your heart, insurance wouldn't pay for that. You don't have a loss yet, right? If you don't have a loss, you don't get insurance. But there's better examples than that. They all come from the case law, which is perfectly consistent on this, including this court's decision in the Millville case. Not published. I understand that. But you've got three smart judges from this court who, under indistinguishable circumstances, hold as a matter of law, Your Honor, that's the key, as a matter of law, that damages are not due to the covered property damage. Again, under essentially indistinguishable circumstances. In Millville, there's a flood that occurs and wrecks the insurance property. And then they try to deal with it and fix it. And they install various temporary measures to get rid of the flood and stop it. Some of that is covered. That's all fine. Nobody disagrees with that. But then what the insurance says is they realize in the course of this that their existing flood mitigation measures aren't good enough and there's going to be another flood and there's going to be more problems. And so they spend money to upgrade and install new flood mitigation measures to prevent the same thing from happening again. And this court, under West Virginia law, unanimously holds that that's not covered because those upgrades are not due to that property, parentheses, except in the sense that they became aware of it because they were investigating and trying to fix the prior problem. Being aware of a problem, for the reasons Judge Winn explained, can't possibly be enough on these facts. Suppose they'd inspected silos 2 and 3 and identified a completely different problem. A completely different problem, Your Honors. It would have to be covered on their theory so long as that completely different problem impaired operations. And there's not one precedent anywhere in the United States or elsewhere, frankly, that justifies insurance coverage in those circumstances for a loss that has not yet occurred. Thank you. Thank you, Mr. Hackett. Mr. Lynn, you have just a few minutes of rebuttal. Thank you, Your Honor. If I could pick up with the Millville point. I think the Millville case actually shows the importance of the language here. If you look at the Millville case from this court, the language in that case was it covered losses due to damage to the covered property. That is not the same language that we have here, which is an operational impairment caused or resulted by a direct physical loss. So the issue in Millville was you had four pumps. Those pumps were damaged. But the policyholder conceded that the damaged pumps weren't the reason why they couldn't pump all the water out. The reason they couldn't pump all the water out was that there was just too much water. So whether those pumps had been damaged or not, the flood would have happened and there would have been loss. So there the loss wasn't due to the damage to the covered property, which was the language there. Here we have a very different language. Can you also address the waiver argument? Yes, Your Honor. So I think it's important to sort of reset and remember what Judge Richardson talked about with the posture that we're in. The posture that we're in is they got a jury instruction. This wasn't the directive verdict is not about an error in the jury's instruction. The jury was instructed on the policy language and they found in our favor. So the question of waiver is did we raise this argument in the post-verdict briefing? That's the only place where this matters. And as Judge Richardson pointed out, we talked about things other than throughput. We say there are five reasons why the period of restoration question rightly went to the jury, and it rightly went to the jury because throughput was one of them, but a whole bunch of other stuff, stockpiles, canceled mining shifts, things that we would have had no reason to talk about but for their effect on business income. And when my friend quoted the policy language to you, he paused and very carefully omitted the phrase business income. He said operations were restored to their but-for level, right? We talked about operations. Everyone talked about operations. That's what's ensured, the restoration of operations. But what does the policy language then say? To what level? Is there a difference? I mean, so it strikes me that the expenses in this case, given that it's a commodity, that the extra expenses and the, like, business income restoration are sort of the same issue. It just happens to be here, right? Because your net income is going to be dependent on the extra expenses that you have to pay once you get throughput back to the same level. Of course, exactly. When you calculate the net income, you're figuring in the revenue and the expenses. So we don't think we waived it below. We talked about all of these things that would have had no relevance other than extra expenses. On hayseeds, on the question of substantially prevailing, I do want to make this clear. We think if we restore the contract damages to 7.6, that the district court's original reasoning is correct and we substantially prevailed. But we also think even if you don't restore it and it's still 1.8, we still substantially prevailed, and here's why. The Hadorn case from West Virginia says that this is not a simple mathematical calculation. You've got to look at the holistic, you know, context of the negotiations, and there's two things I think that are important here. The first is what Judge Richardson pointed out, that the settlement offers that we're talking about, 2.1 on the eve of trial, 11.8 over here, were all inclusive, and the district court found as much. He says that those were all inclusive, and I can give you the JA site if that's important. Hang on one second. Okay, I don't have it here easily. But he says when he first ruled on it that these were all inclusive offers. And so, one, you have to consider, right, it's not just the contract damages, it's the potential fees and the potential aggravation and inconvenience. But the second thing is that this West Virginia Supreme Court, it says you have to look at the context of the negotiations and how long it took. It took them two years to come to the table with even $100,000. And if I could just read one thing, the Jordan case from the West Virginia Supreme Court awarded Hayseed damages, and this is a quote, the insurer refused to offer any amount, much less a reasonable amount, until after the appellant's attorney was retained, the action was filed, and about 17 months had passed since the loss had been incurred. That's what we have here. Thank you, Your Honor. Well, counsel, you heard me previously say we normally would shake your hand. We're doing so virtually today. We hope to do so personally in the future. Thank you both for the fine arguments. The court is going to take a five-minute recess, and then we'll come back to hear the final two cases. The Honorable Court will take a brief recess.
judges: James Andrew Wynn, Stephanie D. Thacker, Julius N. Richardson